The District Court here erred by construing the term universal and the preambles as limiting. The default rule that preambles are non-limiting governs here when we look at each of the guideposts this Court has provided for conducting this inquiry. I'll start with universal is not described as a fundamental characteristic in the specification. In fact, it appears only once in the entire specification in the background of the invention where it says the present invention relates to a unique universal bidirectional system. This sort of distinctly limited description and the use of the word universal tells us it's not a fundamental characteristic. Do you know how the patent examiner treated the preamble during prosecution? I don't think we have the prosecution history. I don't think any party has made any argument based on that. I think it would be insightful to know how it was treated. You're right. No one has made any arguments about how that came to be in the briefing. When the examiner looked at prior art, maybe applied it to the claim, did it consider the preamble part of the claim or not? I'm not aware that the examiner did in fact rely on universal and the preambles in order to assess patentability. I may be able to confer with counsel when I sit down to provide more detail on that point for you, Your Honor. Your argument that it's not limiting, is that made assuming we accept the district court's claim construction? It is not limiting under the district court's claim construction or under the construction that we advanced. It's not limiting in any way in these preambles regardless of the claim construction. If the claim construction requires that it can be inserted in any region using any surgical approach, how would that not be limiting? I'll say two things in response to that, Your Honor. First, I think that district court construction in particular describes a statement of intended use in that it can be in any part of the spine used through any possible implementation, surgical approach. But secondarily, I think when we go to the guidepost about does the body describe a structurally complete invention, it certainly does in both Claim 47 and Claim 1. The body has a structurally complete invention, so even under the district court's construction of universal, the preamble does not have essential structure. We could still remove the word universal from the preambles, and we would see in Claim 47 a very detailed description of the intervertebral cage, and we would see in Claim 1 a complete tool for inserting such a cage. And so in particular, if I talk about Claim 1 under the district court's construction, even grafting all those requirements onto universal, we still have kind of the quintessential recitation of a statement of intended use. It's still a tool for manipulating and inserting this very detailed universal intervertebral bone fusion spacer. So in particular, Claim 1 under the district court's construction, we have one of the most straightforward statement of intended uses that I think we can see. One thing I'm struggling with is when is it that part of the preamble has weight and part of it doesn't. And I think part of the rule with that is that you have to be able to separate out the language, be able to see different parts within the preamble. What is your view of that rule under our precedent? Certainly, Your Honor. So there's not going to be one test. That's not how our precedent works. But the way I would look at it, first, you're right, is it neatly packageable? Can you cut it up in manageable pieces? Here, universal is an adjective. And so it's the sort of thing that can be cleaved off, just like space efficient in the NimbleLink case that we gave you. And if we contrast that with the Bio-Rad case, where this court said we could not really slice and dice it the way that the litigants there wanted, the preamble was quite different. The method was for conducting a reaction in plugs in a microfluid system comprising. And the part they wanted to cleave out was the conducting in. So it was sort of two different parts of a very long clause, where in a case like this, we have universal in the front end of a structure that is then defined in the body and used in the body. And so I wouldn't say every adjective can be cleaved off. I don't think we can just use that as a talisman. But given the kind of work universal is doing in this claim, and given the other guideposts, I think it is something we can... The case you're referring to is the NimbleLink case that you provided? Yes, Your Honor. It's quite a system we've created, haven't we? I mean, claim construction in and of itself is difficult and contentious enough. And now we've got the additional question of whether the preamble is limiting. And then the sub-question of what portion of the preamble, because under your theory, you can slice and dice. That's not a pejorative term. But quite a system, isn't it? On public notice. But I remind us all that the overlay on that system is the default presumptive rule that the preambles are not limiting. And so you really... But Your Honor, but you're even acknowledging that some of the preamble could be limiting and some other portions of it not be limiting, right? In this case in particular, in claim one, don't you concede that some of it is limiting? So I don't think we concede that any of it is limiting. What we said was, really, the slots and the screw guides, they serve as reference points. And then C.R. Bard, just serving as reference points, didn't require them to be limiting. However, if anything, in the preamble of claim one, were to be considered limiting, it would be those slots and the screw guides, the integral screw guides. But I think if you look very closely, they're more reference points. They're not like BICON, where the abutment had a very specific structure and you had to contour and follow that abutment. Here, the slots and the screw guides are more reference points. Is there something to be said about how this preamble might be different from that in New Belink? Because the preamble here is, frankly, just really long. I mean, I'm looking at claim one of the 913 patent, and the preamble itself might be longer, might have more words than the body of the claim. In that circumstance, it's hard to imagine, in some respects, an inventor wouldn't expect that preamble to have some length. Well, I have two responses for that. First, I actually think length often would cut in our favor. If it's very long, it's easier to parse out into discrete subparts. So I wouldn't hang my hat on length as always being something that shows it is limiting. I think in our case, it shows it's not. But again, claim one is interesting in that it is a tool for manipulating and inserting this universal intervertebral bone fusion spacer. That is quintessential youth function. And then it describes the thing that's going to be inserted, the context, the intended use of the tool that's being claimed. And then it reinforces right before comprising that the body is going to be describing the actual affirmative limitations of the tool. It says the tool comprising. The tool comprising. That's right. You would say we should ignore everything that comes from universal and beyond, including the two wearing clauses, and then give weight to the tool comprising. That's exactly right, Your Honor. Again, the second wearing clause describes some of the reference points that are used later. But the entire preamble, and in particular, the reference points are related to the cage, the intervertebral cage. Those are reference points of the cage, not the universal intervertebral bone fusion spacer. The spacer includes the cage, and then the cage is described, but ultimately, the body of the claim is all about the tool. Before your time runs out, do you want to touch briefly on the second issue of cooperating? Yes, Your Honor. Did you have questions on the actual construction of universal? Because we could talk about that. I mean, it does exclude every single embodiment in the claim, and then press the specification. There's not a single embodiment that is described as being used in each and every location of the spine. I would draw your attention at column two. It says, herein we describe multiple device embodiments. It talks predominantly about an embodiment, a physical device that goes in the lumbar region of the spine. And when it goes on to talk about how it might be modifiable, it's talking about the teachings could be modifiable. It talks about extraordinary screw box, and those teachings could be then modified so that the screw box could be used in a different portion of the spine. Those are teachings about the invention. They're not saying there's any one device that can be itself changed. And I would draw your attention to claim 38, which talks about selecting the bone fusion spacer based on the measured dimensions of the disk space. Selecting something that already exists, not modifying the spacer so that it can be put into a different part based on dimensions of the disk space. So I think when we look very closely at the specification, there's no embodiment that a physical device is modified so it can go into lumbar versus cervix. Instead, the teachings are there. The innovative screw box is able to be incorporated into an appropriately sized spacer for the neck, and one that's sized for the lumbar. Respectfully, the district court is misreading the specification, and in particular, if you wanted to look at appendix 197 at column 3 down around line 51, where it talks about the expendable embodiment of the screw box, can also be enlarged and modified to be suitable for cervical, thoracic, and lumbar vertebral body replacement. A body replacement means you take out the vertebrae itself, not the disk. And most of what the specification talks about, you stick the spacer between two vertebrae. And here, it's not saying you could place it anywhere between two vertebrae. It's saying you would actually replace and remove the vertebrae and use the cage instead. And that is a teaching about how broad the invention is. You use the cage with the two screw guides. It has a lot of applicability, but no one physical device itself is modified to go into any portion of the spine. I am in my rebuttal time. I certainly want to answer questions you might have on cooperating, but I want to be respectful of time. Good morning. John LaHotte of Sussman & Goffey for the Acolyte Globus Medical. So plaintiff's arguments are divorced from the intrinsic record, the claim language, the spec, and how they, how Moskowitz, applied the claims in this litigation. Let's start with this argument that Claim 1 of the 913 is directed solely to the tool. We know that can't be right. First, there are, I'm sorry. Just, what points to that conclusion is the first word, which says a tool, and then even before comprising, it says the tool comprising, right? Yes, but there are dependent claims that don't say anything about the tool. There are dependent claims that describe just the cage, Claims 10 through 14. Those claims describe attributes of the cage. So if Claim 1 is all about the tool, then what are we doing with Claims 10 through 14? What work do they do? They have to do some work. They're not just there for garnishment or surplusage. What about the argument that True and the cage was recited in the body of the claim, but it's other parts of the preamble that our law would require us to not give way to? So it sounds like Your Honor is asking about splitting or slicing and dicing. Yeah, that is exactly what I'm asking about. I'm like, I'm just imagining what the response is from opposing counsel to your argument, based on what we've heard argued to us, which is that, you know, either one way to look at it under our precedent is that an adjective like universal should not be given weight under the case that was cited in the 20HA letter. So I just, what is your response to that? So while it is true that this Court has, if I can borrow your phrase, sliced and diced the preamble before, it has cautioned against doing that in situations where you can't neatly package the preamble. And in this case, well, let's go back to TomTom. In TomTom, the portion of the preamble that was deemed non-limiting was superfluous or redundant, giving that the quote-unquote generating and updating appeared in the body. Okay? That's not the case here. The Universal Screw Guide and Fixation Apparatus, or the Universal Interval Achievable Bone Fusion Spacer, is the invention, and it's used and referenced in the dependent claims. And if you were to take TomTom as a blueprint and say, we're going to try to slice and dice this preamble as TomTom. I just want to understand, what is your basis for saying it is the invention? I can see you saying it's part of the invention, but how do you say it is the invention? Are you saying the tool is not the invention? The tool is part of the invention. The cage is just as part of the invention as the tool. And it's the only invention in it. Do you take that from the fact that it's in the preamble, or do you take it from the fact that it's in the specification? Both. It's in the preamble. It's in the claims. In the 9-1-3 patent, every time you see spacer in the claims, it's preceded by Universal Interval Achievable Bone Fusion Spacer. As the district court found, not just any spacer, but a universal spacer. And it's in the specification. Repeatedly. I understand that universal is not used with frequency in the specification, but all you've got to do is read the spec to see what the inventors are talking about. But it's not in the embodiments. I think it is in the embodiments. There's no differentiation between embodiments based on certain features and whether those features would be used in certain regions of the spine. What is your best place in the specification to support what you just said? Sure. I've got a few, if I can get a few in. This is the 9-1-3 spec. Column 1, lines 35 through 43, talks about posterior lumbosacral and thoracic spine. And then these are posteriorly and anteriorly placed, may obviate the need for supplemental screw fixation. If we go on to, we stay in column 1, the problem that is identified by the patentees is a problem they see with fusion techniques in all regions. What line numbers are you on? Are you still in column 1? I am still in column 1, yes, Your Honor. It's going to be lines 53 to 57. Let me make sure I'm giving you the right size. So that's page A-250. You said the 9-1-3 spec. Yes, it's going to be in the spec at 250. Right, and this is right about, this is in the appendix at 250. This is line, column 1, line 54. The problem is, currently the majority of posterior cervical and almost all anterior and posterior lumbosacral and thoracic spine are in the appendix at 250. Fusion techniques are supplemented with pedicle screw placement. That's the problem. We have these fusions in all three regions. It doesn't say the problem. It doesn't use that word. I just want to make sure because you're not quoting it correctly. If you're going to be quoting something, make sure you quote it accurately, please. The reason why I refer to it as the problem is if you fast forward to column 12, it goes back to that problem and it uses the word problem. If you can go to column 12 at lines 16 through 20, that's going to be in the appendix at 255. The present inventions may provide effective and safe techniques that overcome the problems associated with current transpedicular-based cervical, thoracic, and lumbar fusion technology and for many degenerative, stable, and unstable spine disease. That's why I phrase it as the problem identified. Then we look in column 11 as well where you've got lines, this is also on appendix 255, lines 29 through 33 and 49 to 54 which talk about using that construct in the anterior, thoracic, and lumbar spine. It also talks about the posterior placement of the constructs. These things that you're referring to, these are talking about the idea that these cages, lack of a better word, can be used in all the different ways in which they're placed in and different places in the body in which they can be inserted. Yes, and without changing the allegedly inventive aspects of the cages or the spacers. There's only two things... They just have to change the size and things, that seems to be... There's two ways, I'm sorry, there's two ways to use, the specification says to use these implants in different regions. Neither of them have anything to do with the inventive aspects of it. Change the size and use two, this is in figure four. You can change the size which is immaterial to the inventive aspects or you can just use two which is what we see in figure four and that's described as the lumbosacral implementation. Nothing changes about the cage or the spacer. The screw guides are the same, the ridges are the same, the slots are the same, the method of expansion, if it's expandable, is the same. They're just using two, which makes sense. If you've got a larger disk space down there, you can just use two. Those are the only two ways that the spec discusses how the embodiments would differ in the various regions of the spine. And I take it then that the accused device doesn't operate that way, it can only be used to put in certain parts of the body? Correct. Never change the size and things like that? You can change the size a touch, but they're indicated for use in certain approaches and in certain regions. So the answer to your question is yes. I want to go back to the tool, the argument that it's just a tool or it's just intended use. We know that's not right because of the claim language. Like I said, claims 10 through 14 of the 913 are not directed to the tool. They're directed to the cage. And also, if claim one was directed to just the tool, then Moscovitz would not have accused the implants of infringement as it did. And if claim one is just the tool, then how are they accusing the implant of infringement of claim one, which is what they did below? You can see that in the district court referred to it, Appendix 29. Their Plaintiff's Damages Report discusses this at Appendix 3096. It's in our Statement of Undisputed Facts below at 3132. Moscovitz's response to our Statement of Undisputed Facts where they acknowledge this is at 3717, and our expert report discussing this is at 3151 through 57. And of course, they needed to accuse the implants because that's where the damages are. We don't sell the tools. The tools are consigned. They're loaned out. We don't sell them. The only thing that is sold is the implants. You can see some factual background about us not selling the tools at Appendix 3278-79 and then in some discovery responses in the Appendix 3585. So, patentee's interpretation of claim one throughout most of this litigation, including for purposes of damages and infringement, was that claim one was drawn to the implant as well. And that distinguishes what we have here from Moscovitz's favorite case, C.R. Bard. In C.R. Bard, the claimant issue was directed to the biopsy needle with a tissue sampling device. There's some language regarding the biopsy gun in that device. That gun language was held as not part of the separate claims to the needles. But in that case, the plaintiff limited its interpretation of claim 21 to the needle and then argued that language about the gun was not limited. In our case, as I said, Moscovitz accused the implants as well as the instruments of infringing. It didn't limit the infringement allegation to the tool. So, I don't think it can be heard now to say that the claim is limited to just the tool. And again, this is not to mention that there are dependent claims that have nothing to do with the tool. Now, if I can go back to Your Honor's question about splitting the claim limitation or the preamble. If we want to go back to the TomTom case, which they hinge this idea on. In TomTom, the language at issue involved generating and updating. And the court held, well, generating and updating, that's intended use. That's not limiting. In our case, if we want to do it using TomTom as a blueprint, what we could do is say, okay, manipulating and inserting may not be limiting. That's akin to generating and updating. But the remainder is. Right? In TomTom, the court held that, or actually commented that the district court correctly held that the device was limiting. Because the claim was not directed to just any mobile unit. It was a specific type of mobile unit in TomTom. Likewise, in this case, we're not talking about just any spacer. It is a universal one. Yeah. And I don't think additive. I don't think. Saying that it was intended use, right? So this would be an intended use of the device that the school was inserting. Yeah, I think the Nimbaline case is just an opposite. In that case, the court held that space efficient was not limiting. And the court held that space efficient doesn't extol the virtues or benefits of the invention. In this case, universal does. It is the invention. It's unlike a Nimbalink where the panel noted that the specification discussed various design choices that it could achieve these space savings. That's not the case here. It's a hard thing to parse, to be honest with you. For you to say it is the invention. Is the hard thing for me to know. I do think it's hard to parse. Don't get me wrong. I agree. But I'm just saying that your distinction of the case isn't doing it for me. Because it's hard, as I sit here and you say universal is the invention. I just don't know how I'm supposed to know that in an objective way. I think that the claim language and the specification get you there. I think the repeated use of, and taking a look at the court, district court did. I'll be able to look at that other case and I'll be able to see that in that patent specification. It's not in the claim, the language, and it's not mentioned or emphasized in the specification. Not in the same way. I bet it's in the claim and I bet it's in the specification. It's clearly in the claim. So there needs to be, I don't understand that as a basis for distinguishing. I want to reiterate that it's not just an issue of fundamental characteristic. There's also the notion of antecedent basis. I don't know if Space Efficient was providing any kind of antecedent basis in that claim. Whereas in this case it does. Again, you've got universal preceding intervertebral bone fusion spacer in every case. You've got claims 5 and 9 which rely on claim 1 for antecedent basis. You've got claims 49, 55, and 57 of the 022 which rely on the preamble to claim 47 for antecedent basis. So there are multiple guideposts as counsel noted. And I think that all of them militate in favor of finding the preamble limiting in this case. I don't think you can slice and dice it. Certainly not with any kind of clarity or fairness. And in a manner that provides sufficient notice to the public about what's claimed and what's not. So while I agree that slicing and dicing the preamble is possible, I don't think it's possible accurately in this case. Thank you. Unless there are any questions on the JMAL, happy to rest the papers on that. Thank you. Thank you. So let me address a couple of things. First, I would say it is not the invention. And I'll introduce you to two places that I think really bring this part home in appendix. Unfortunately, my sites are usually 022. So appendix 197, column 3, around line 34, starting at line 31. You've got to give me which pattern. This is the 022, appendix 197, column 3, starting at line 31. And it says, the novelty of this design is the built-in prescribed angles of the integral screw guides which allow the posterior transvertebral penetration into the vertebral bodies. This is a truly amazing feat accomplished in the posterior lumbar spine considering the anatomy. They're saying the pedicle screws were a problem and this screw box, this cage, was very useful. And in column 12 of the 022 patent, at the very end in appendix 201, line 64, to our knowledge there have not been any previously described similar posterior lumbar and thoracic combined spacer and screw constructs. The novelty is the screw box, the dual function nature. It has nothing to do with using the same physical device and moving it from location to location. If I can address a couple of your other questions, with respect to claims 49 and 57 of the 022, all that says there is the apparatus of claim 47. It doesn't even repeat the universal aspect of it, showing intentionality for the preamble not to be providing antecedent basis. In terms of why did we accuse the implants when we were going after the tool, appendix 3132 is not in the joint appendix, but I think he's confusing a damages model construct with what the claim actually is about. And I think we can see claim 1 is about the tool, and the rest of it is... What was the damages model to get the device that's inserted using the tool? I don't have the details at my fingertips, but you can certainly envision that the value of the tool might have something to do with how often it is used to actually implant these implants into people. And so I think that's sort of a diversion. But I heard him say they don't sell the tool. But again, not selling the tool, it could be that the value of using the tool in an indirect infringement model could be tied to how many... Was it collateral? What was the basis for... You don't remember what the damages model was? I don't actually have all those details, and it's not in the joint appendix. I was just trying to address this portion of the appendix that's literally not in the joint appendix, and so I'm providing a little context. It's hard to know, honestly, assess the value of that argument. And then to answer the question you raised earlier, Judge Stoll, universal did not come up during the regular prosecution. During the IPR, there were some IPRs that failed, and in our response to the IPR, we point out a procedural flaw, and this is that Appendix 3699 describes in background. Was it during the original prosecution? Universal never came up. The preambles and universals did not come up during the ordinary prosecution. So universal was added later? That's what I'm told. It was added during the amendment, during the IPRs? It was not relied upon to get over prior art during the original prosecution. But no, how did the examiner treat it? Did not mention it, as far as I know. Did not mention it, but I do want to... The IPR's Appendix 3699 explains that when they put in their petition, they put forth their construction that the district court adopted, but then they made no effort to meet it at all. And based on that procedural flaw, we pointed that out. And so we didn't rely on universal to get over prior art in the IPR. It was purely their petition was defective. Thank you.